IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JOSEPH C. PITTS, #A0259019, | ) | CIV. NO.11-00281 LEK/RLP |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANTS' |
| vs. | ) | MOTION FOR SUMMARY JUDGMENT; |
| | ) | EXHIBIT A |
| FRANCIS SEQUEIRA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Joseph C. Pitts, a prisoner proceeding pro se, claims that past and present Hawaii Department of Public Safety ("DPS") employees violated his constitutional rights and state law when they enabled, or failed to protect him from, an assault by another inmate while he was a pretrial detainee at the Oahu Community Correctional Center ("OCCC").[1]

Before the court is Defendants' Linda Moga Rivera, Tom Leland, M.D., Sam Tanuvasa, and Fred Hernandez (collectively, "Defendants"), Amended Motion for Summary Judgment.  Defs.' Mot., ECF No. 112; Mem. in Support, ECF No. 112-1; Concise Statement of Facts ("CSF"), ECF No. 113.  Defendants assert that they were unaware of a threat to Pitts before the assault and therefore neither acted with deliberate indifference to his safety nor

_____

[1] Pitts is now incarcerated at the Halawa Correctional Facility("HCF"), but during all relevant times he was housed at OCCC.

retaliated against him for exercising his First Amendment rights. Defendants argue that they are entitled to qualified immunity. Pitts has filed an Opposition to the Motion, ECF No. 162, and Defendants have filed a Reply, ECF No. 169. Defendants' Motion is GRANTED IN PART as detailed below.

## I.  **BACKGROUND**

On Friday, September 11, 2009, Pitts was housed in solitary confinement in the OCCC disciplinary segregation Holding Unit, classified as a Medium custody pre-trial felon. *See* Pitts' Ex. O, ECF No. 163-19; Pitts Decl. ECF No. 163-3. Pitts saw guards take inmate Jose Nievis from the Holding Unit in handcuffs at or about 8:15 p.m., and saw Nievis return approximately one hour later with injuries Pitts describes as consistent with an assault. *See* First Amended Compl. ("FAC"), ECF No. 46, PageID #278; Pitts Decl., ECF No. 163-2, ¶5. Nievis allegedly told Pitts that two inmate S.O.S. Crips gang members,[2] Tauese Manuele and Manuele's unidentified cellmate, attacked him outside of the Holding Unit while Adult Correctional Officers ("ACOs") Mattson, Texiera, Talemoa, Blas, and "Sgt. John Doe" "watched, incited, and encouraged" the assault. FAC, ECF No. 46, PageId #278; *see also* Defs.' CSF, Grievance No. 16139, ECF No. 113-2, PageID #628. Pitts was put on suicide watch that day, although it is unclear

---

[2] Pitts is apparently referring to the "Sons of Samoa" street gang, which he alleges is based in Hawaii at the Kuhio Park Towers ("KPT") apartment complex in Honolulu.

whether this occurred before or after Nievis' assault.  *See* Pitts Decl., ECF No. 163-2 ¶ 10.

On Saturday, September 12, 2009, Pitts met with OCCC psychiatrist Peter Yamamoto, M.D., in the Holding Unit.  *See* Pitts' Ex. F, ECF No. 163-11.  Dr. Yamamoto's medical notes indicate that Pitts said, "I never was suicidal, I'm in suicide watch b/c HU [Holding Unit] ACO's wanted to separate us[] I'm fine, I'm not suicidal."  *Id.*  Dr. Yamamoto discontinued Pitts' suicide watch, recommended that he be returned to general population, continued his medication, and scheduled a follow up visit in one month.  *Id.* ("(1) D/C SW -> to G.P. [;] (2) cont. with meds[;] (3) F/U 1 month 10/12/09").

Pitts alleges that he wrote the DPS Internal Affairs Division, the Department of Justice, the Hawaii Office of the Ombudsman, the Federal Bureau of Investigation ("FBI"), and the Hawaii Attorney General on or about September 12, 2009, regarding Nievis' assault.  *See* ECF No. 113-2, PageID #628.

On Sunday, September 13, 2009, Pitts completed and signed two grievances: No. 161631, for Nievis,[3] and No. 161639, for himself.  Grievance No. 161639 states:

> I am filing this grievance because I firmly
> believe my life is in danger, And if I Am
> held in the Holding Unit for the remainder of
> my sanction time, the Officers involved in

---

[3] Because Nievis speaks Spanish, he asked Pitts to assist him.

the set up and beating of detainee Jose L.
Nievis while in handcuffs, will have me set
up or killed[.]  On September 11, 2009,
between the hours of 7 pm and 9 pm I was an
eye witness to the events that ultimately led
up to inmate Jose L. Nievis being maliciously
beaten in handcuffs while four officers
watched, condoned and encouraged it.  And I
fear because of this knowledge and my
assistance in helping Spanish inmate Jose L.
Nievis file his complaint (Grievance No.
161631) and call the Federal Bureau of
Investigation, Ombudsman and the Dept of
Public Safety Internal Affairs, I will be
targeted for assault and or death.  The
Officers and Inmates involved in the attack
are Officers Texiera, Talemoa, Blas, Sgt. on
Duty Mattson.  Inmates Bird and his roommate
located in Cell 9 on the second floor (Bird
is his nickname) and according to Jose[,]
inmate Garteluna also housed on Second Floor.
I would like to call my attorney John M.
Schum, Ombudsman[,] Internal Affairs and [be]
rehoused in Module One for my safety.

ECF No. 113-2 PageID #628.  It is initialed as received by prison

officials first on September 14, and again on September 16, 2009.

*See* ECF No. 113-2, PageID #628.

On Monday, September 14, 2009, at approximately 3:00

p.m., Pitts met with part-time OCCC psychiatrist Defendant

Dr. Leland.  *See* Leland Decl., ECF No. 113-4, PageID #631-32.

Dr. Leland's notes indicate that Pitts told him, "I want to move

to Mod 1 - I'm not suicidal yet and don't want to get worse - HU

[holding unit] not good for me."  ECF No. 113-5, PageID #633.

Dr. Leland further noted that Pitts was "worried about possible

retribution from staff because he witnessed abuse of another IM

[inmate] and has reported the abuse - [by] letter to FBI and

4

Bureau of Prisons." *Id.* Dr. Leland's notes show that he told Pitts, "'since Mod 1 is crowded and you are not suicidal I will have to discuss move to M.1 with Dr. Evans + Yamamoto.'" *Id.* This was Dr. Leland's only encounter with Pitts.

Defendant Inmate Grievance Specialist ("IGS") Rivera says she received Grievance No. 161639 on Wednesday, September 16, 2009. *See* CSF, Rivera Decl., ECF No. 113-1, PageID #626. Rivera responded to it the next day, September 17, 2009. *See* ECF No. 113-3. She explained to Pitts that filing a preemptive grievance because he feared retaliation for submitting the grievance and assisting Nievis was improper because there was nothing yet to grieve; she told Plaintiff to contact the Chief of Security or the Warden with his fears.[4] *Id.* Rivera returned the grievance to Pitts, but she forwarded a copy of it to the OCCC Administrative Captain and Chief of Security to alert them about Pitts' fears. Rivera Decl., ECF No. 113-1, PageID #627.

On the same morning that Rivera received the grievance, September 16, 2009, five inmates were scheduled to attend the OCCC law library: John Correia, Alabanza (Chris) Tuimaleaiifano, Tauese Manuele, Tyson Liulama, and Pitts. Pitts' Ex. O, ECF No. 163-19, PageID #1061. Pitts was classified as a Medium security

---

[4] It is unclear how Pitts should have notified the Warden or Chief of Security about his fears, other than through a grievance and by alerting his treating psychiatrist, without alerting the very guards he feared.

pretrial felon (PTF/DC) and Tuimaleaiifano was classified as a Minimum security probation violator ("PRBV/DC"); both were housed in disciplinary segregation in the Holding Unit.[5]  Pitts' Ex. O, ECF No. 163-19, PageID #1061.  None of the inmates at the law library on September 16, 2009, were classified as maximum security.  *Id.*  Tuimaleaiifano, Manuele, and Liulama each submitted law library attendance requests on September 8, 2009, several days before the assault on Nievis and a week before Pitts' attack.  Gunn Decl., ECF NO. 163-25.  Neither Tuimaleaiifano nor Manuele had requested to be scheduled for the law library in the three months before September 8, 2009, however.  *Id.*

On September 16, 2009, ACO Tanuvasa placed leg irons, rather than handcuffs, on Tuimaleaiifano's wrists for his transport to the law library.  Tanuvasa says he did so because Tuimaleaiifano's wrists were too large for handcuffs and prison policy allowed this substitution in this situation.  Tanuvasa Decl., ECF No. 113-6, ¶ 3.  Tanuvasa asserts that he was not aware of any general threats to Pitts from ACOs or gang members, specific animosity between Pitts and Tuimaleaiifano, or of Pitts'

---

[5] Tuimaleaiifano had five incident reports in the four months prior to the September 23, 2009 investigation report, three for assault and use of physical force, and two for use of force or threats to a correctional officer.  Ex. O, ECF No. 163-19.  It is unclear whether the Pitts' assault was included in these five charges.

fear of reprisal from gang members or ACOs.  *Id.* ¶ 4-5.

        ACO Hernandez was monitoring the law library on
September 16, 2009.  At approximately 9:05 a.m., Tuimaleaiifano
slipped a hand from the leg irons on his wrists and began to
assault Pitts.  FAC, ECF No. 46, PageID #279; Hernandez Decl.,
ECF No. 113-7 ¶ 3.  Hernandez called for backup, and says he
attempted to separate Pitts and Tuimaleaiifano until assistance
arrived.  Hernandez Decl., ECF No. 113-7 ¶ 3.  Pitts says that
Tuimaleaiifano struck him "about 20 more times" before backup
assistance arrived, when he "felt officers grab [Tuimaleaiifano]
off of him."  FAC, ECF No. 46, PageID #279.  Pitts was taken to
the OCCC medical unit and treated.  Hernandez Decl., ECF No. 113-
7 ¶ 3.  Hernandez charged Tuimaleaiifano with assault and
reported that Pitts "never threw a punch, but rather[,] defended
himself by covering up from the punches."  *Id.*, ECF No. 113-8,
PageID #640.  Hernandez says that he was unaware of animosity
between Tuimaleaiifano and Pitts, or that Pitts was concerned for
his safety from the gang members or ACOs who were allegedly
involved in the assault on Nievis.  Hernandez Decl., ECF No. 113-
7 ¶ 4.

        Pitts claims that (1) he informed Dr. Leland and IGS
Rivera of his fears of reprisal from the ACOs and gang members
involved in Nievis' attack before his own attack, but they failed
to protect him; (2) Tanuvasa enabled Tuimaleaiifano's assault by

improperly substituting leg irons for handcuffs, which Pitts alleges were too loose; and (3) Hernandez failed to intervene when Tuimaleaiifano began to assault him, all with deliberate indifference to Pitts' safety.  Pitts alleges Defendants' actions violated the United States and Hawaii Constitutions and his "protected liberty interest [under] Dept of Public Safety Policy 493.12.01 and 493.12.03."[6]  FAC, Counts I-IV, ECF No. 46, PageID #280-83.

## II.  LEGAL STANDARDS[7]

### A.  Summary Judgment

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear

---

[6] Section 493.12.01, titled "Right to Safe Custody," provides that prison employees shall take reasonable steps to protect inmates from violent assaults from other inmates or facility personnel.  Section 493.12.03, titled "Inmate Grievance and Appeals Process," governs the DPS grievance process.

[7] Pitts received notice of the requirements for opposing Defendants' Motion.  *See* ECF No. 114 (*Rand* Notice provided concurrently with Amended Motion); ECF Nos. 28, 75, 85, 86, 101 (previous *Rand* Notices); *see also Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998); *Woods v. Carey*, 684 F.3d 934, 935-36 (9th Cir. 2012).

the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586–87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

The opposing party need not establish a material issue of fact conclusively in its favor to establish a factual dispute. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

## B.   Qualified Immunity

Qualified immunity shields government officials from liability for civil damages so long as their actions do not violate clearly established statutory or constitutional rights of

which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity will not protect the "plainly incompetent" or those "who knowingly violate the law." *Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1180 (9th Cir. 2007) (quoting *Hunter v. Bryant*, 502 U.S. 224 (1991)).  Qualified immunity balances the need to hold government officials accountable for irresponsibly exercising their authority, with the need to protect officials from harassment, distraction, and liability when reasonably performing their duties. *Pearson*, 555 U.S. at 231.

A qualified immunity analysis has two parts: "whether, taken in the light most favorable to the party asserting the injury, that party has established a violation of a federal right[,]" *Preschooler II*, 479 F.3d at 1180 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001); and whether this right was clearly established at the time of the defendant's alleged misconduct. *Saucier*, 533 U.S. at 201.  The "clearly established" test is satisfied when unlawfulness is apparent in light of preexisting law. *Preschooler II*, 479 F.3d at 1180 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  A third question may also be considered: "whether the officer could have believed, reasonably but mistakenly . . . that his or her conduct did not violate a clearly established constitutional right." *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006); *but see*

*Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007) (third prong considered instructive but not determinative).

The plaintiff bears the burden of showing that the right he or she claims was violated was clearly established. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). If the plaintiff meets this burden, the burden shifts to the defendant to demonstrate that the defendant reasonably believed the alleged conduct was lawful. *Trevino v. Gates*, 99 F.3d 911, 916-17 (9th Cir. 1996). Courts may exercise their sound discretion in deciding which of the two *Saucier* prongs to address first. *Pearson*, 555 U.S. at 236.

## III. <u>DISCUSSION</u>

"To sustain an action under section 1983, a plaintiff must show '(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right.'" *Hydrick v. Hunter*, 500 F.3d 978, 987 (9th Cir. 2007) (citation omitted), *vacated and remanded on other grounds*, 129 S. Ct. 2431 (2009); *accord West v. Atkins*, 487 U.S. 42, 48 (1988).

## A. Failure to Protect

Prison officials are required to take reasonable measures to guarantee the safety of inmates and they have a duty to protect prisoners from violence at the hands of other

prisoners.[8] *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).  To state a claim for failure to protect from threats to safety, an inmate must allege facts to support that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were "deliberately indifferent" to his safety. *Farmer*, 511 U.S. at 834; *Frost*, 152 F.3d at 1128; *Redman v. County of Los Angeles*, 942 F.2d 1435, 1443 (9th Cir. 1991) (*en banc*).  That is, Pitts must set forth facts supporting an inference that Defendants knew of, but disregarded, an excessive risk to his safety.  *Farmer*, 511 U.S. at 837.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Frost*, 152 F.3d at 1128; *Redman*, 942 F.2d at 1442.

A showing of deliberate indifference "does not require that the guard or official 'believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault.  But, on the other hand, he must have more than a mere suspicion that an attack will occur.'" *Berg v. Kincheloe*,

---

[8] Pitts was a pre-trial detainee at OCCC.  His claims therefore arise under the Fourteenth Amendment's Due Process Clause, but are nonetheless evaluated under Eighth Amendment standards.  *See Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010)

794 F.2d 457, 459 (9th Cir. 1986) (citations omitted).  The deliberate indifference standard is therefore one above mere suspicion, but below absolute certainty or intent to inflict harm.

## B.    Retaliation

Prisoners have a constitutionally protected right to file grievances.  *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003).  As such, prison guards are prohibited from retaliating against prisoners for filing grievances.  To establish a claim for retaliation, a prisoner must allege that (1) a prison official took some adverse action against him (2) because of (3) the prisoner's protected conduct, and that such action (4) chilled the prisoner's exercise of his First Amendment rights, and (5) did not reasonably advance a legitimate correctional goal.  *Wood v. Beauclair*, 692 F.3d 1041, 1051 (9th Cir. 2012); *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote omitted).

## B.    Defendant Rivera

Pitts claims that IGS Rivera failed to protect him from Tuimaleaiifano's assault and failed to properly follow the prison's grievance policy set forth in PPM § 493.12.03.[9]  *See*

---

[9] Pitts provides incomplete, non-consecutive sections of PPM 493.12.03, marked with asterisks and arrows denoting his argument.  *See* ECF Nos. 163-14, 163-18.  Because PPM 493.12.03 is publicly available at the Martin J. Pence Court Library for the
(continued...)

FAC, Count I, ECF No. 46, PageID #280, *see also* Ex. A attached to Order.  Pitts alleges that he submitted Grievance No. 161639 on September 13, 2009, and concludes that Rivera therefore knew about his fears before the attack occurred on September 16, 2009, and did nothing to prevent it.  Rivera counters that she received Pitts' grievance on September 16, 2009, the day of the attack, responded to it within twenty-four hours, and was unaware of his fears before the attack.

Accepting that Pitts deposited Grievance No. 161639 into the prison's grievance receptacle immediately after signing it on Sunday, September 13, 2009, this does not establish that Rivera received it the same day.  Grievance No. 161639 is initialed on the top right-hand corner by an unidentified ACO as received on Monday, "9/14/09."  *See* ECF No. 113-2.  There is a second notation in different handwriting showing "W05/**IGS** 9/16," indicating that IGS Rivera received Grievance No. 161639 on September 16, 2009, as she attests.  It is undisputed that Rivera responded to the grievance on September 17, 2009.  *See* ECF No. 113-3.

Pitts submits two other grievances that he filed that were also initialed by prison officials as received the day after

---

[9](...continued)
District of Hawaii, the court reviewed it in its entirety, and attaches it to this Order.  *See* DPS PPM 493.12.03, eff. Apr. 3, 1992 (att. as Ex. A).

he signed them, initialed again two days later, and answered four to eleven days thereafter. *See* Pitts' Exs., ECF No. 163-12, 163-13. For example, Pitts signed Grievance No. 161650 on September 18, 2009, it is initialed received on "09/19/09," and again "9/21." *See* ECF No. 163-12. Rivera responded to it four days later, on September 24, 2009. *Id.* Pitts signed Grievance No. 149756 on October 31, 2009, it is initialed as received on "11-1-09," again on "11/2," and responded to by the "IIO," on "11/13/09." ECF No. 163-13. These documents show a pattern that supports Rivera's declaration that she received Grievance No. 161639 three days *after* Pitts signed it.

Although the court must draw all reasonable inferences in favor of the non-moving party, Pitts fails to support his conclusory allegations that Rivera received Grievance No. 161639 before the attack with admissible evidence. Pitts provides nothing tending to show that Rivera would have received his grievance the same day that he signed it or earlier than she declares she did. Rather, the undisputed evidence supports Rivera's assertion that she received Grievance No. 161639 on September 16, 2009, the same day that Pitts was attacked. And there is no indication that Rivera was aware of Pitts' letters to the FBI, DPS Internal Affairs, the Ombudsman, or others detailing his fears.

Moreover, the court finds no violation of the sections of PPM § 493.12.03 that Pitts marked in support of his claims against Rivera.  First, Rivera did not refuse to accept or process Grievance No. 161639 as he alleges.  Rather, she explained that his grievance was speculative because nothing had happened yet to grieve.  *See* PPM §§ 493.12.03.4; 493.12.03.13-14.

Second, Rivera recognized that Pitts was attempting to alert prison officials of his fears, and forwarded his grievance to the Administrative Captain and Chief of Security to investigate Pitts' claims and take necessary precautions.  *See* PPM §§ 493.12.04.1(b)(5); 493.12.03.4.1(b)(2).  Thus, although Pitts claims that Rivera did nothing to protect him, the record shows that she clearly took steps to alert prison officials about Pitts' fear of assault, albeit too late to prevent the attack at issue.

Third, by returning Pitts' grievance to him with this information, Rivera effectively explained the steps she had taken to protect him.  *See* PPM § 493.12.03.8(c)(4).  And finally, insofar as Pitts alleges that Rivera failed to track this grievance in the prison computer system, he provides no evidence to support this speculation, or show how a failure to do so caused him any harm.  *See* PPM § 493.12.03.4(a).  These are the only sections of the PPM § 493.12.03 to which Pitts refers and the court will not scour the record to determine whether PPM

17

§ 493.12.03 otherwise establishes a genuine issue of material fact. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *see also Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007) (holding that a district court has no duty to search for evidence of a factual dispute, even if the opposing party is pro se).

Pitts cannot rely on his own declaration to refute Rivera's statement. He must provide evidence tending to show that Rivera received the grievance early enough to take steps to prevent the attack. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (stating that the court must consider a pro se plaintiff's contentions in motions and pleadings as evidence in opposition to a motion for summary judgment when they are based on personal knowledge and set forth facts that would be admissible in evidence); *see also Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the non-moving party relies on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.").

Pitts fails to show that Rivera knew of a substantial risk of serious harm to him before the attack and was nonetheless "deliberately indifferent" to his safety. He also fails to show that she violated PPM §§ 493.12.01 or 493.12.03. Rivera is entitled to qualified immunity and summary judgment is GRANTED as

18

to Pitts' state and federal claims against her.

**B.   Defendant Hernandez**

Pitts alleges that ACO Hernandez did "absolutely nothing" to protect him while Tuimaleaiifano attacked him in the law library.  FAC, Count III, ECF No. 46, PageID #279.  Pitts must show that Hernandez "[knew] of and disregard[ed] an excessive risk to [his] . . . safety," that is, that Hernandez was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that he drew that inference.  *See Farmer*, 511 U.S. at 837; *see also Simmons v. Navajo County*, 609 F.3d 1011, 1017 (9th Cir. 2010).  Hernandez can avoid liability by presenting evidence that he lacked knowledge of the risk or by presenting evidence that he made a reasonable, albeit unsuccessful, response to a risk.  *See Farmer*, 511 U.S. at 844–45; *see generally Berg*, 794 F.2d at 462.

First, to the extent that Pitts claims that Hernandez knew or should have known that Tuimaleaiifano (or other gang members) posed a threat to Pitts and failed to prevent the attack, his claim fails.  As noted, Rivera did not receive Pitts' grievances until the day of the attack.  This was too late for her to inform OCCC officials of Pitts' fears, so they could alert OCCC staff to take precautions to prevent an attack on Pitts. Even if Pitts wrote DPS Internal Affairs, the Ombudsman, the FBI, and the Department of Justice on Saturday, September 12, 2009, as

he claims, the record is devoid of evidence that these agencies received his letters and alerted OCCC officials of Pitts' fears before Tuimaleaiifano attacked him.  Pitts therefore fails to show that Hernandez was aware of an excessive risk to Pitts' safety before the attack occurred.

Second, Hernandez reasonably responded to Tuimaleaiifano's attack.  Hernandez declares that he called for backup when Tuimaleaiifano began assaulting Pitts.  Hernandez Decl., ECF No. 113-7 ¶ 3.  Pitts concedes that back up officers arrived shortly after the attack began, and stopped the attack.  *See* FAC, ECF No. 46, PageID #279 ("After being hit about 20 more times plaintiff then felt officers grab [Tuimaleaiifano] off him.").  Pitts does not explain who alerted these officers, if not for Hernandez.  Pitts admits that he was blindsided, "dazed and off balanced," and struggling to protect himself from Tuimaleaiifano's blows during the attack, implicitly acknowledging that he did not observe what Hernandez did during the attack.  FAC, ECF No. 46, PageID #279.

Although Pitts says inmate Tyson Liulama "confirm[ed] Defendant Hernandez did nothing to stop [Tuimaleaiifano] from hitting me," Liulama refuses to provide a verified statement to this effect, rendering this inadmissible hearsay.  Pitts Decl., ECF No. 163-2.  Even if the court could accept Liulama's alleged statement, Pitts fails to address Hernandez's need to protect

20

himself and the other inmates present, while restoring order and maintaining control in the law library until backup assistance arrived.  When a prison disturbance occurs, prison officials must make "decisions 'in haste, under pressure, and frequently without the luxury of a second chance.'"  *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)).  This court is loathe to second guess prison employees' split second decisions made to restore order and ensure safety. Clearly, Pitts is mistaken that Hernandez did "absolutely nothing," when the attack began.

Viewing the evidence in the light most favorable to Pitts, the court finds that Hernandez did not act with deliberate indifference to a substantial risk of serious harm to Pitts or violate PPM § 493.12.01.[10]  Hernandez is entitled to qualified immunity and summary judgment is GRANTED as to Pitts' state and federal claims against him.

## C.    Defendant Tanuvasa

Pitts alleges that ACO Tanuvasa failed to protect him, retaliated against him, and violated prison policies when he substituted leg irons for handcuffs to restrain Tuimaleaiifano's wrists.  *See* FAC, Count IV, ECF No. 46, PageID #283.  Pitts claims that Tanuvasa is a member of or associated with the S.O.S.

---

[10] Hernandez was not involved in Pitts' grievance and PPM § 493.12.03 does not apply to him.

21

Crips gang, as is Tuimaleaiifano and the inmates who assaulted Nievis.  Pitts concludes that Tanuvasa therefore acted in retaliation for Pitts' reporting the S.O.S. gang attack on Nievis.

Tanuvasu counters that Tuimaleaiifano's wrists were too large to accommodate handcuffs and that he followed an unwritten prison policy allowing the substitution of leg irons for handcuffs when an inmate's wrists are too large.  Tanuvasa states that he was unaware that Pitts had reported the S.O.S. gang attack on Nievis, feared reprisal from other S.O.S. gang members, or that there was antagonism between Pitts and Tuimaleaiifano. *See* Tanuvasa Decl., ECF No. 113-6 ¶¶ 3-5.

### 1. *No Evidence That Tanuvasa Was Aware of Pitts' Grievances or Associated with the S.O.S. Gang*

As noted, Rivera did not receive Pitts' grievances until the day of the attack, too late to alert OCCC staff to take extra precautions to prevent an attack on Pitts from gang members.  Pitts therefore fails to show that Tanuvasa had any reason to suspect that Pitts was at a risk of violence from Tuimaleaiifano in particular or S.O.S. gang members in general when he readied Tuimaleaiifano for transport to the law library. Without such knowledge, Tanuvasa could not have acted with deliberate indifference to Pitts' safety.

Even presuming that Tanuvasa knew Pitts reported the S.O.S. gang members' attack on Nievis, Pitts fails to provide

evidence showing that Tanuvasa was associated with the S.O.S. Crips gang and his actions were motivated by this alleged association.  Pitts claims that Kuhio Park Terrace housing complex is a known S.O.S. Crips gang residence and elicits Tanuvasa admission that he once lived at Kuhio Park Terrace.  *See* ECF No. 163-23 ("Pitts: Have you ever lived at Kuhio Park Terrace (KPT) housing apartments? Tanuvasa: Yes").  Pitts then concludes that Tanuvasa is or was an S.O.S. gang member and acted in support of the gang.  Pitts provides no objective, admissible evidence that Kuhio Park Terrace is a "known" gang residence, however, or that Tanuvasa's prior residence at Kuhio Park Terrace proves that he is affiliated with the S.O.S gang.  This is simply Pitts' unsupported speculation, not competent, circumstantial, evidence.

Pitts next alleges that inmate Liulama, an alleged S.O.S. gang member, told him that Tanuvasa is an "O.G. for S.O.S."[11]  Pitts Decl., ECF No. 163-2.  Pitts says that Liulama refuses to submit an affidavit stating this, however, because Liulama said that Tanuvasa is his uncle.  *Id.*  As noted above, Liulama's unverified statements to Pitts are inadmissible hearsay.  Moreover, Tanuvasa flatly denies being related to Liulama, *see* ECF No. 163-23, and Pitts fails to refute this with

---

[11] "O.G.," is slang for "original gangster."  *See*, http://www.urbandictionary.com/define.php?term.

competent evidence or to provide any other evidence showing Tanuvasa's alleged gang connection.

Pitts asserts that Tanuvasa admitted guilt when he allegedly stated, "Don['] t blame Masoi or Sgt Thompson[,] I did it.  I'm the one who put the cuffs on Chris," and "I read your report[,] good luck on [g]etting it filed."  FAC, ECF No. 46, PageID #279; *see also* Vierra Decl., ECF No. 163-7 (stating, "I heard officer Tanavasa come up to the 3rd floor and say[,] 'Pitts[,] don't blaim [sic] Mosoi[,] I did it.  I am the one who put the cuffs on you.  Do what you got to do Pitts.");  Randle Decl., ECF No. 163-8 (stating, "I . . . heard ACO Tanuvasa, tell inmate Pitts, that he put the handcuffs [on] the inmate who jumped him inside the law L[i]brary.").  Considering these statements in the light most favorable to Pitts, they only support the uncontested fact that Tanuvasa accepted responsibility for restraining Tuimaleaiifano; they are not an admission of deliberate indifference or retaliation.

Pitts fails to show that Tanuvasa substituted leg irons for handcuffs to enable Tuimaleaiifano's attack *because* he is associated with the S.O.S. gang, either with deliberate indifference to Pitts' safety or in retaliation for Pitts' reporting an attack by other S.O.S. gang members on Nievis.  *See Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) ("To prevail on a retaliation claim, a plaintiff must show that his protected

24

conduct was 'the "substantial" or "motivating" factor behind the defendant's conduct.'").

### 2.   *No Violation of Prison Policies*

Pitts claims that Tanuvasa violated prison policies (and state law) by failing to provide him safe custody pursuant to PPM § 493.12.01.[12]   After in camera review, Magistrate Judge Chang and Magistrate Judge Puglisi granted Pitts limited access to the confidential sections of PPM COR.08.24 and others, detailing the DPS' policies for the use of restraints.  *See* Orders, ECF Nos. 78, 80, 141, 145, 146, 150.  In general, these confidential sections provide that inmate restraints should be used when needed to prevent harm to the inmate or others and to maintain security without creating pain, restricting circulation, or causing discomfort.  *Id.*, SEALED PageID #1070 (PPM COR.08.24.3.1).; *see also* Tanuvasa Interrog. No. 14, ECF No. 163-23, PageID #1078.  The degree of restraint used is determined by various criteria, including the inmate's charges, security classification, potential for violence or dangerousness, escape risk, and attitude toward the movement.  *Id.*, SEALED PageID #1072, (PPM COR.08.24.4.1).  Inmates in disciplinary segregation, such as Pitts and Tuimaleaiifano, are generally required to be restrained for all movements.  *Id.*, SEALED PageID #1075 (PPM

---

[12] Tanuvasa is not alleged to have been involved with Pitts' grievance and PPM § 493.12.03 does not apply to him.

7.11.50.9).

Pitts states that Tuimaleaiifano was a validated violent gang member, thus, prison policy requires leg restraints and handcuff covers when he is transported.  Pitts says he intends to "subpoena two Arizona guards to refute" Tanuvasa's claim that Tuimaleaiifano's wrists were too large for handcuffs. Pitts' Opp'n, ECF No. 163, PageID #1021 (stating that he will provide Tuimaleaiifano's "S.T.G. documentation to his membership in the S.O.S. gang").  Pitts fails to provide any evidence supporting these allegations, however, although this incident occurred four years ago and he commenced this action two and a half years ago.[13]

There is no dispute that Tuimaleaiifano was classified as a *minimum* custody parole violator on the day of the attack. *See* Pitts' Ex. O, ECF No. 163-19.  Tuimaleaiifano was not reclassified until after the investigation on Pitts' assault. *Id.*  While this may have been in error based on Tuimaleaiifano's incident reports in the four months prior to the investigation of Pitts' attack, *see id.*, there is no evidence that Tanuvasa was or should have been aware of Tuimaleaiifano's incident record,

---

[13] The court has extended the discovery deadline and trial date several times, actively intervened in Pitts' many discovery disputes, ensured that Pitts received the caselaw he requested, and extended the time for Pitts' to file his Opposition to this Motion.  *See e.g.*, ECF Nos. 37, 71, 77, 78, 93, 100, 101, 111, 129.

beyond his classification as a minimum custody inmate in disciplinary segregation.  It is further undisputed that Tuimaleaiifano was being transported within the facility, thus, posing less risk of escape.

After a close review of DPS' Confidential PPM COR.08.24, the court finds that Tanuvasa did not violate prison policy or procedure when he restrained Tuimaleaiifano on September 16, 2009, as Pitts alleges.  *See* SEALED ECF No. 163-22, PageID #1070-76.  The record shows that Tuimaleaiifano was classified as minimum custody, was only being transported within OCCC to the law library, and had no apparent gang validation or other documented reasons for Tanuvasa to believe that he was an extreme escape risk or posed a particular danger to himself, Pitts or others.  Tanuvasa was not required to use heightened restraints on Tuimaleaiifano, such as leg irons or handcuff covers, pursuant to DPS policy.  Nor is there any evidence showing that Tanuvasa violated the PPM when he substituted leg irons for handcuffs.  Tanuvasa did not violate a clearly established right or violate state law when he restrained Tuimaleaiifano for transport to the law library on September 16, 2009 and is entitled to qualified immunity.  Summary judgment is GRANTED as to Pitt's state and federal claims against Tanuvasa.

### 4. Claims Against Dr. Leland

The record substantiates that Pitts told Dr. Leland about his fears of reprisal from gang members and guards on or about 3:00 p.m., Monday, September 14, 2009, approximately two days before Pitts was attacked.  Dr. Leland, a part-time psychiatrist at OCCC, apparently told Pitts that he did not have the authority to move him to Module 1, which was overcrowded, but that he would speak with Drs. Evans and Yamamoto about a transfer.  The record does not reflect whether Dr. Leland did so; Pitts was attacked less than forty-eight hours later.

Dr. Leland points out that Pitts was not attacked in the Holding Unit, from which he sought a transfer, suggesting that whether he had alerted Drs. Evans and Yamamoto was immaterial to whether Pitts would be attacked.  Dr. Leland provides no evidence to support this speculation, however.  It is reasonable to infer that, had Dr. Leland notified Dr. Evans, Dr. Yamamoto, or other prison officials of Pitts' allegations, they could have alerted staff and taken extra precautions to protect Pitts from known gang members and their associates regardless of his housing unit.  The question is not whether prison officials failed to transfer Pitts to Module One.  It is whether Dr. Leland knew of a substantial risk of serious harm to Pitts and ignored that possibility with deliberate indifference to his safety.  A genuine issue of material fact remains whether

Dr. Leland knew of a substantial risk of serious harm to Pitts and was deliberately indifferent to his safety by failing to notify prison officials or take other steps to protect Pitts.

Dr. Leland is not entitled to qualified immunity. It was clearly established by 2009, when the attack on Pitts occurred, that the failure of a prison official to respond to a known, credible threat to an inmate's safety constituted a violation of the inmate's Eighth Amendment rights. *See Berg*, 794 F.2d 460-61. As an OCCC physician and employee, Dr. Leland had a duty to protect the inmates under his care. Dr. Leland acknowledges that Pitts explicitly discussed his fear of an assault from the gang members and officers who were involved in Nievis' attack two days before Pitts was attacked. It is unclear what, if anything, Dr. Leland did in response to Pitts' request for protection because Dr. Leland asserts he has no recollection of the conversation, despite his own notes detailing Pitts' fears. Based on the record before the court, it is impossible to determine whether Dr. Leland reasonably but mistakenly believed that his conduct did not violate a clearly established constitutional. *See Skoog*, 469 F.3d 1221, 1229 (9th Cir. 2006). It is unclear whether Dr. Leland recognized the risk to Pitts on the information that he was given, whether Dr. Leland took any steps to protect Pitts, or even what actions Dr. Leland should have taken in this instance. A reasonable jury could find that

Pitts' fears were credible, Dr. Leland was aware of those fears, and failed to take adequate steps to protect Pitts with deliberate indifference to his safety.  Summary judgment is DENIED as to Pitts' claims against Dr. Leland.

### IV.  CONCLUSION

(1)  Defendants' Motion for Summary Judgment is GRANTED as to Pitts' claims that Defendants' Rivera, Tanuvasa, and Hernandez failed to protect him from assault or retaliated against him in violation of federal or state law.

(2) Summary judgment is DENIED as to Pitts' claims against Dr. Leland.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, January 14, 2014.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

*Pitts v. Sequeira, et al.*, Civ. No. 11-00281 LEK; PSA/Ords 2013/Pitts 11-281 lek (MSJ draft); J:\Denise's Draft Orders\LEK\Pitts 11-281 lek (partial grt MSJ).wpd